O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES RONALD BARKS,<br><br>    Plaintiff,<br><br>  vs.<br><br>CASTLEPOINT NATIONAL INSURANCE COMPANY ET AL.,<br><br>    Defendants. | Case No.: SACV 13-00954 DOC(Ex)<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [20]** |

Before the Court is Defendant CastlePoint National Insurance Company's ("CastlePoint") motion for summary judgment (Dkt. 20). After considering the moving and replying papers and hearing oral argument from both parties, the Court **DENIES** the motion.

**I.**    **Background**

     **a. The Subject Property**

Plaintiff Ronald Barks ("Barks") purchased a property at 247 Morning Canyon, Corona Del Mar, California (the "Subject Property"), in 2005. Compl. (Reilly Decl. (Dkt. 20-2)) ¶ 8.

1  Barks contracted with Carlos Gonzalez, d/b/a Gonzo Construction ("Gonzalez") to build an
2  investment home on the property for resale. *Id*. The Subject Property is in a residential
3  community that uses Covenants, Conditions and Restrictions ("CC&Rs") to govern
4  development projects within the community. *See* Plaintiff's Statement of Genuine Issues
5  ("PSUF") ¶ 3. The CC&Rs prohibited building a home over 24 feet tall. *See id*. ¶ 4. Around
6  late March 2008, Gonzalez completed the home. *See id*. ¶ 5. The final house, however, was
7  more than 24 feet tall. *See id*. ¶ 6. Gonzalez had to perform additional construction, including
8  lowering the roof, to remedy the problem. *See id*. ¶ 7. Barks sold the home in August 2009 for
9  $4.975 million. *See id*. ¶ 8.

10  On February 15, 2011, Barks filed a complaint in Orange County Superior Court against
11 Gonzalez alleging causes of action for negligence and breach of contract. *See* Compl. at 6-9.
12 The Complaint stated that the framing had originally been measured incorrectly, without taking
13 into account the addition of the roof. *See* Compl. ¶¶14-15. The Complaint alleged damages
14 based on Barks's being forced to pay interest on acquisition and construction loans while the
15 defect was fixed, being forced to pay the costs associated with lowering the roof, being forced to
16 pay attorneys' fees and costs associated with disputing the Homeowner's Association's clams
17 about the roof height, and losing value on the property as the real estate market declined. *See*
18 Compl. at 6-9. Gonzalez tendered the complaint to CastlePoint via an insurance broker. *See*
19 Stipulated Facts ("SF") (Dkt. 21) ¶ 1. CastlePoint wrote back on May 26, 2011 and disclaimed
20 coverage. *See id*. ¶ 2. CastlePoint claimed that the alleged damage was not covered as "bodily
21 injury" or "property damage" arising out of an "occurrence" that qualified for coverage under
22 Gonzalez's policies, and that several exclusions applied even if the conduct were covered. *See*
23 Reilly Decl. Ex. D at 5. Barks filed a First Amended Complaint ("FAC") on September 26,
24 2011 alleging negligence and breach of contract. *See* FAC (Reilly Decl. Ex. E) at 8-10. The
25 FAC added as an additional basis of damage the inability to use or enjoy the home for an
26 additional four to eight months during additional construction, and alleged pre-construction
27 mistakes as a partial cause of the height discrepancy. *See* FAC ¶¶ 21, 29. On September 28,
28 2011, Gonzalez tendered the FAC to CastlePoint via insurance broker. *See* SF ¶ 4.

In September 2012, Gonzalez and Barks entered into a stipulated judgment for $1,000,000 and Gonzalez assigned his rights against his insurers to Barks in exchange for a covenant not to execute. *See* PSUF ¶ 15. On March 26, 2013, Barks filed the instant action against CastlePoint and others in Superior Court alleging breach of contract, bad faith, violation of California's Unfair Competition Law ("UCL"), declaratory relief, and promissory estoppel. *See* Notice of Removal (Dkt. 1) Ex. A. The causes of action are all premised on the alleged failure to defend Gonzalez and to pay damages under the insurance policies.

### b. The Insurance Policies

Gonzalez liability insurance policies with CastlePoint: Policy Number 10ATMAG-201561-GL01 (effective May 30, 2006 to May 30, 2007) and Policy Number 10ATMAG-201561-GL02 (effective May 30, 2007 to May 30, 2008). *See id.* ¶ 17.

Both CastlePoint policies contained the following terms:

> COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
>
> 1. Insuring Agreement
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" and "property damage" only if: (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and (2) the "bodily injury" or "property damage" occurs during the policy period."

PSUF ¶ 18.

The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See id.* ¶ 19. "Property

damage" is defined as "physical injury to tangible property, including all resulting loss of use of that property," or "loss of use of tangible property that is not physically injured . . ." *Id.* ¶ 20.

### c. The Exclusions

Both policies included Exclusion section (j), excluding from coverage "property damage" to:

> (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> (6) That particular part of any property that must be restored, repaired, or replaced because "your work" was incorrectly performed on it. . . .
>
> ¶(6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

*Id.* ¶ 21.

Both policies define the term "products-completed operations hazard" as:

> 16. "Products-completed operations hazard":
>
> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> . . .
>
> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
> (a) When all of the work called for in your contract has been completed.
>
> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>
> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

*Id*. ¶ 22.

Finally, both policies define "your work" to mean:

a. Means: (1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations.  b. Includes: (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and (2) The providing of or failure to provide warnings or instructions.

*Id*. ¶ 23.

### II.     Legal Standard

#### a.    Summary Judgment

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The court must view the facts and draw inferences in the manner most favorable to the non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case.  *Celotex*, 477 U.S. at 323.  When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case.  *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial.  *See Liberty Lobby*, 477 U.S. at 248-49.  A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ."  *Id.* at 248.  A party cannot create a genuine issue of material fact simply by making assertions in its legal papers.  *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*,

690 F.2d 1235, 1238 (9th Cir. 1982).  Rather, there must be specific, admissible evidence identifying the basis for the dispute.  *Id.*  The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein.  Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]."  *Liberty Lobby*, 477 U.S. at 252.

### b. Duty to Defend

The duty to defend is triggered when the insurer "becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement."  *Id*. at 19.  "This duty, which applies even to claims that are 'groundless, false, or fraudulent,' is separate from and broader than the insurer's duty to indemnify."  *Id*.  "The insurer is excused from its defense obligation only when the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage."  *Fire Ins. Exch. v. Superior Court*, 181 Cal. App. 4th 388, 391-92 (2010) (internal citations and quotation marks omitted).

### III. Discussion

Defendant moves for summary judgment on the basis that, as a matter of law, the acts alleged by Barks were not covered under the insurance policy and so CastlePoint had no duty to defend.  Defendant also moves for summary judgment on the question of bad faith, arguing that it had a reasonable basis for denying coverage and so cannot be held liable for a bad faith failure to defend or indemnify.

### a. Whether the Conduct Qualifies as an "Occurrence"

CastlePoint argues first that it is entitled to summary judgment because Gonzalez's failure to construct the house according to the CC&Rs was not an "accident" and so not an "occurrence" that was covered by the policies.  "When determining whether a particular policy provides a potential for coverage and a duty to defend, we are guided by the principle that interpretation of an insurance policy is a question of law."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995).  The insured party bears the burden of bringing the conduct in question

within the coverage terms of the policy. *See id*. at 16. CastlePoint argues that Gonzalez intentionally took each step necessary to create the home that exceeded the height requirement. The fact that the result was unintended, CastlePoint argues, does not make the actions themselves "accidental." Rather, they were mistakes. Barks responds that the act of constructing a 26-foot house was a mistake and that there are material issues of fact as to what specifically was done to cause that result, rendering summary judgment on this question inappropriate.

California law defines an accident as an "unintentional, unexpected, chance occurrence." *St. Paul Fire & Marine Ins. Co. v. Superior Court,* 161 Cal. App. 3d 1199, 1202 (1984). "An intentional act is not an 'accident' within the plain meaning of the word." *Id.* at 596 (internal citation omitted). "[C]overage is not always precluded merely because the insured acted intentionally and the victim was injured. An accident, however, is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforseen happening occurs that produces the damage." *Merced Mutual Ins. Co. v. Mendez,* 213 Cal. App. 3d 41, 50 (1989). In determining whether there is an "accident" when "the insured intends his actions, but not the resulting damage . . . 'the courts have focused on the nature of the act giving rise to the claims." *Allstate Ins. Co. v. Salahutdin*, 815 F. Supp. 1309, 1310–1311 (N.D. Cal. 1992) (internal citations omitted). "Thus, 'where the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury.'" *Id.* The *Mendez* Court described the distinction as follows:

> When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous. Accordingly, the occurrence resulting in injury would be deemed an accident. On the other hand, where the driver was speeding and deliberately hit the other car, the act directly responsible for the injury—hitting the other car—would be intentional and any resulting injury would be directly caused by the driver's intentional act.

*Mendez*, 213 Cal. App. 3d at 50.

Many courts have considered the question of accidental conduct. For example, in *Scheffler*, the court held that intentional actions to block a gate and bulldoze a roadway could not be considered "accidents" even though their consequence, the flareup of a plaintiff's medical condition, were entirely unforeseen. *See Scheffler v. Allstate Ins. Co.*, 196 F. Supp. 2d 1003, 1005-06 (C.D. Cal. 2002) ("However, the bodily injury itself cannot be the unforseen event. Instead, the cause of the bodily injury must be the unforseen event. Since the insured intended all of the acts that resulted in the victim's . . . injury, then the acts cannot be deemed "accidents. . . ."). In *McGranahan*, the court held that installing moldy drywall could constitute an "accident" under a CGL policy because the intentional act at issue was not the fact of hanging any sheetrock, but rather whether the insured intended to cause the damage by hanging wet and moldy sheetrock. *See McGranahan v. Ins. Corp. of NY*, 544 F. Supp. 2d 1052, 1059 (E.D. Cal. 2008). Because there was conflicting evidence on whether the insured intended to hang wet and moldy drywall, rather than simply intending to hang drywall, the court found that the insurer had a duty to defend. *Id*. In *Ray*, the court found no accident when a consultant hired to give a professional opinion gave bad advice. *Ray v. Valley Forge Ins. Co.*, 77 Cal. App. 4th 1039, 1046 (1999) ("Association's complaint alleges that Ray acted deliberately as a professional consultant hired to provide advice. It alleges that Ray intended Association to use the materials he selected. The allegations state that Ray deliberately intended to induce reliance on his recommendations. As such, Association's complaint does not allege tort liability covered by the CGL policy."). Thus, if the Court construes Gonzalez's actions as intentional acts that were simply not intended to cause injury, they are arguably not accidents. On the other hand, if the Court construes those actions as not intending to create a house over 24 feet tall but failing, they arguably could constitute an "occurrence" that would trigger a duty to defend and possibly indemnify.

Compounding this issue is the fact that the precise cause of the height difference is also not clear from the record. Gonzalez noted multiple measurement problems and mistakes: at least one measurement irregularity in the plans, Gonzalez Dep. (Russo Decl. Ex. 5) at 71; an

unexplained one-foot discrepancy for which Gonzalez could not identify a cause, Gonzalez Dep. at 108; one foot that was intentionally added to the top story because Gonzalez believed there was a foot to spare, Gonzalez Dep. at 109; and three extra inches on the slab that may have been caused by an elevation miscalculation, Gonzalez Dep. at 109.  Gonzalez testified that one foot of the discrepancy was clearly caused by his intentional act of building the house an extra foot higher because he thought they could add one foot and still be in compliance.  Regarding the other extra foot, however, Gonzalez testified that "I don't think anybody knows and I don't think it's every going to be clear.  Because none of the measurements match."  Gonzalez Dep. at 114.

CastlePoint argues that there can be no accident here because Barks's argument relies on a mistake of law or fact, which cannot serve as the basis for an accident.  CastlePoint argues that each individual action needed to build the house was done by Gonzalez's volition, and so the results cannot be accidental even if their legal import was unintended.  CastlePoint cites *Delgado v. Interinsurance Exch.*, 47 Cal. 4th 302 (2009) and *Fireman's Insurance Exchange v. Superior Court (Bourguignon)*, 181 Cal. App. 4th 388 (2010) in support of its argument.  These cases are unpersuasive, however.  In *Delgado*, the California Supreme Court held that a battery could not be an "accident" when the actions were all intentional, even if based on a mistaken belief that self-defense was appropriate.  *See Delgado*, 47 Cal. 4th at 312 ("Here, insured Reid's assault and battery on Delgado were acts done with the intent to cause injury; there is no allegation in the complaint that the acts themselves were merely shielding or the result of a reflex action. Therefore, the injuries were not as a matter of law accidental, and consequently there is no potential for coverage under the policy.").  Similarly, in *Bourguignon*, the court noted that a party's mistaken belief that it owned a plot of land did not convert its intentional and trespassory building on that land into an "accident."  *See Fire Ins. Exch. v. Superior Court*, 181 Cal. App. 4th 388, 396 (2010) ("So too here, the Bourguignons intended to build the house where they built it.  Accepting their contention that they believed they owned the five and one-half foot strip of land and had the legal right to build on it, the act of construction was intentional and not an accident even though they acted under a mistaken belief that they had the

right to do so. . . . [T]he Bourguignons' mistaken belief in their legal right to build does not transform their intentional act of construction into an accident.").

First, this theory assumes that the sole cause of the height problem was attributed to Gonzalez believing that he could build a house over 24 feet and doing so intentionally. There is mixed evidence in the record regarding why the house was actually over the limit, although Gonzalez did testify that at least one foot of that height was intended. Of course, CastlePoint did not have that information when it evaluated the tendered complaints for coverage. Based on the complaints themselves, and CastlePoint's theory in its motion, the only basis for summary judgment assumes that Gonzalez's intent to produce a 24-foot house was irrelevant; all that mattered was the intent to perform each individual act that created the home. That theory cannot support summary judgment on the duty to defend.

The theory does not track with case law discussing a mistake of fact or law that later turned out to be incorrect. Instead, the complaints set out an intent to build a 24-foot house, with the result of producing a 26-foot house, albeit through individual intentional actions. This is distinct from *Scheffler* or *Delgado* or *Bourguignon*, in which the acts leading up to the injury were all achieved exactly as intended and planned, but then caused an unexpected result or were based on faulty information. Here, the steps taken to create the faulty product did not go as intended or originally planned. The building of a 26-foot house was not intentional, and does not fit the mold of those cases finding entirely intentional conduct. It is therefore not possible to grant summary judgment in CastlePoint's favor on this basis.

### b. Whether the Section j. Exclusions Bar Coverage

CastlePoint also argues that exclusions j(5) and j(6) barred coverage for "faulty workmanship." Barks counters that the "products-completed operations hazard" exemption from the Section j exclusions applies because Gonzalez's work was completed and the property had been put to its intended use.

Exclusions like j(5) and j(6) are referred to as "faulty workmanship" exclusions, and "preclude coverage for deficiencies in the insured's work." *Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Arizona*, 193 Cal. App. 4th 1311, 1325 (2011). "The exclusion found in j(5)

-10-

applies to works in progress. The insurer is not obligated to indemnify a policyholder for property damage that occurs while the insured is performing operations on that property." *Id*. The exclusion found in j(6) excludes coverage for the physical injury to, or loss of use of, that part of the property that must be replaced because [the contractor's] work was performed incorrectly." *Id*. at 1326. The "products-completed operations hazard" coverage applies to j(6) and provides coverage for "bodily injury" or "property damage" arising out of "your product" or "your work" unless the work "has not yet been completed or abandoned." These exclusions generally are designed to support the proposition that: "Generally liability policies . . . are not designed to provide contractors . . . with coverage against claims their work is inferior or defective. The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer." *Maryland Casualty Co. v. Reeder*, 221 Cal.App.3d 961, 967, 270 (1990).

It appears that the exclusion under j(5) does not apply because there is no allegation that property damage occurred while work was in progress on the property. "The exclusion found in j(5) applies to works in progress. The insurer is not obligated to indemnify a policyholder for property damage that occurs while the insured is performing operations on that property." *Clarendon*, 193 Cal. App. 4th at 1325. In this case, the damage at issue was not caused during construction or otherwise while the work was underway. Instead, the allegation is that the completed work product was inadequate.

Exclusion j(6) is more apt, as it excludes from coverage any property that must be "restored, repaired or replaced" because the insured's work was "incorrectly performed." This would fit the case at issue, in which the house required substantial additional work because the initial work was wrong. Barks argues, however, that the "products-completed operations hazard" coverage applies and so the j(6) exclusion is not applicable. This hinges on whether the home was "completed" before Gonzalez undertook the additional work to lower the roof. For purposes of this case, the house was complete when either "all of the work called for in [the] contract [had] been completed," or when "that part of the work done at a job site has been put to its intended use." However, "[t]he point at which a job site has been put to its intended use is a

-11-

question of fact to be determined under the conditions and circumstances of each case." *N. Am. Capacity Ins. Co. v. Claremont Liab. Ins. Co.*, 177 Cal. App. 4th 272, 286 (2009). In light of this, the Court cannot determine as a matter of law at this time whether the j(6) coverage exclusions applied.

### c. Summary Judgment on Bad Faith under the Genuine Dispute Doctrine

CastlePoint argues that it is alternatively entitled to summary judgment on the question of bad faith because there was a genuine dispute as to whether coverage existed under the policy. Barks responds that a total failure to investigate can constitute bad faith, and that material issues of fact exist regarding whether CastlePoint's conduct was reasonable.

A court can conclude that an insurer's denial of coverage was not unreasonable as a matter of law and therefore grant summary judgment on this issue. "In order to establish a breach of the implied covenant of good faith and fair dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001). "[T]he ultimate test of liability in the first party cases is whether the refusal to pay policy benefits was unreasonable." *Austero v. National Cas. Co.,* 84 Cal. App. 3d 1, 32 (1978). The breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself. *See California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 54–55. "Bad faith implies unfair dealing rather than mistaken judgment . . . " *Id.* (internal quotations and citation omitted). An insurer may be found liable in bad faith if it fails to adequately investigate a claim, *see Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 817 (1979), denies coverage based on an unduly restrictive policy interpretation or standard known to be improper, *see Love v. Fire Ins. Exch.,* 221 Cal.App.3d 1136, 1148 (1990), unreasonably delays in processing or paying claims (*see id.*), or forces the insured to file suit in order to recover policy benefits, *see Brandt v. Superior Court,* 37 Cal.3d 813, 820 (1985). Even when a claim is ultimately found to be payable under policy terms, a court can conclude as a matter of law that the insurer's denial of a claim is not unreasonable. *See Franceschi v. American Motorists Ins. Co.*, 852 F.2d 1217, 1220 (9th Cir. 1988).

Where a "genuine issue" exists as to the insurer's liability, summary judgment on the bad faith question is appropriate. *Guebara*, 237 F.3d at 992. Courts have rejected bad faith claims under the genuine dispute doctrine based on interpretation disputes over policy language. *See American Casualty Co. v. Krieger,* 181 F.3d 1113, 1123 (9th Cir.1999) (finding a genuine dispute under California law whether "sport or athletic contest/event" language included bungee jumping); *Franceschi*, 852 F.2d at 1220 (applying California law and finding a genuine dispute about the meaning of "medical treatment" in pre-existing condition clause of policy); *Hanson v. Prudential Ins. Co.*, 783 F.2d 762, 766 (9th Cir. 1985) (finding a genuine dispute as to whether preadolescent residential treatment facility constituted a "hospital" under the policy as construed pursuant to California law).

Although the case law is not obvious on the precise contours of an "accident" under the law, the Court finds there are material issues of fact regarding the reasonableness of CastlePoint's denial, investigation, and interpretation. The face of the complaints suggested possible accidental sources for the home's height, and did not directly support CastlePoint's interpretation. There is not sufficient evidence in the record to show that CastlePoint's denial of coverage was reasonable as a matter of law, and at least some material facts suggesting it may not have been. The Court agrees that the declaration of David Ezra is improper to the extent that it opines on the meaning of the law, and cautions Barks that any further testimony in that vein will be rejected.

The Court therefore DENIES the motion as to the claim for a breach of the covenant of good faith and fair dealing.

**IV.     Disposition**

Based on the foregoing, the Court DENIES the Motion for Summary Judgment.

DATED:     March 26, 2014

*David O. Carter*
_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE